**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

LAWRENCE CHARLES MATTHEWS, a/k/a
MrMature, a/k/a Dd4SubFem, a/k/a
LCMinMD,
Defendant-Appellant.

AMERICAN CIVIL LIBERTIES UNION;

AMERICAN CIVIL LIBERTIES UNION OF
MARYLAND; AMERICAN CIVIL
LIBERTIES UNIONOFTHE NATIONAL
CAPITOL AREA; NATIONAL
ASSOCIATIONOF CRIMINAL DEFENSE
LAWYERS; THE REPORTERS
COMMITTEEFOR FREEDOMOFTHE
PRESS,
Amici Curiae.

No. 99-4183

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Alexander Williams, Jr., District Judge.
(CR-97-270-AW)

December 1, 1999

Decided: April 13, 2000

Before MOTZ and TRAXLER, Circuit Judges, and
Cynthia Holcomb HALL, Senior Circuit Judge of the
United States Court of Appeals for the Ninth Circuit,
sitting by designation.

_____

Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge Traxler and Senior Judge Hall joined.

_____

**COUNSEL**

**ARGUED:** Beth Mina Farber, Chief Assistant Federal Public Defender, Baltimore, Maryland, for Appellant. Jan Paul Miller, Assistant United States Attorney, Greenbelt, Maryland, for Appellee. **ON BRIEF:** James Wyda, Federal Public Defender, Baltimore, Maryland, for Appellant. Lynne A. Battaglia, United States Attorney, Deborah Johnston, Assistant United States Attorney, Greenbelt, Maryland, for Appellee. Arthur B. Spitzer, AMERICAN CIVIL LIBERTIES UNION OF THE NATIONAL CAPITAL AREA, Washington, D.C.; Dwight Sullivan AMERICAN CIVIL LIBERTIES UNION OF MARYLAND, Baltimore, Maryland; Ann Beeson, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for Amici Curiae ACLU, et al. Jane E. Kirtley, Executive Director, Gregg P. Leslie, Jacqueline N. Ballinger, THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, Arlington, Virginia, for Amicus Curiae Committee.

_____

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

This appeal arises from the conviction of an award-winning journalist for sending and receiving child pornography over the Internet. The reporter admits that he traded in the pornography but maintains that he did so only to research a news story. He contends that when such acts are committed solely for a valid journalistic purpose, the First Amendment provides a defense to criminal conviction, and he appeals the district court's refusal to permit him to present this defense to a jury. Because we conclude that the First Amendment provides no defense in these circumstances, and because we reject the reporter's other arguments, we affirm.

2

I.

Lawrence C. Matthews has worked as a broadcast journalist for more than twenty-five years. Most of that time was spent as a staff reporter or news director of radio stations in the Washington, D.C. area. Matthews has also worked and, in fact, is currently working in television. In addition, he has written print stories for several newspapers, including an article on homelessness for The Washington Post, which he researched by spending a week on the streets as a homeless person. In 1983, his documentary piece on Vietnam veterans, "They Served with Honor," won numerous journalism honors, including the George Foster Peabody Award.

In 1995, while working as a business news reporter for WTOP radio in Washington, D.C., Matthews produced a three-part radio series highlighting the existence of child pornography on the Internet. During the course of his research for that series, Matthews contacted the FBI to inform the agency about the availability of child pornography on-line and to report that he had been in contact over the Internet with a woman who offered her two children for prostitution.

In January 1996, after leaving WTOP to become a freelance reporter, Matthews maintains that he continued to investigate child pornography on the Internet for journalistic purposes. He sought to determine whether child prostitution "was real or just something people talked about" and focused on the nature and scope of law enforcement efforts to eliminate child pornography. Matthews believed that his investigation of these topics might yield a saleable story. This further investigation forms the basis for his subsequent convictions for trafficking in child pornography.

In March 1996, America OnLine, Inc. shut down Matthews' account in response to his attempt to create his own chat room called "SugarDad4yFem." From July through December 1996, Matthews logged on to other chat rooms, initiated conversations with individuals who identified themselves as minor females, and engaged them in sexually explicit discussions. Many of these on-line conversations actually involved FBI agents who were posing as minor females. Matthews claims that he was aware of this fact and that the agents' activi-

3

ties were part of his research on the role of law enforcement in policing child pornography on the Internet.

During this same period, the FBI documented approximately 160 photographs depicting child pornography either sent or received by Matthews over the Internet. Matthews asserts that he did not know that sending and receiving child pornography was illegal. He maintains that only by trading in child pornography could he "infiltrate a world he otherwise would have no access to." According to Matthews, those trafficking in child pornography would not "converse" with him unless he forwarded pornographic images to them, thereby demonstrating he was not associated with law enforcement authorities.

The FBI had begun monitoring Matthews' on-line activities in the early summer of 1996. On September 17, 1996, an FBI agent met with Matthews ostensibly to discuss the earlier information he had given to the FBI in the course of his investigation for the WTOP series. At that time, Matthews did not inform the agent that he was presently receiving and transmitting child pornography, nor did the agent inform Matthews that such activity was illegal.

Three months later, on December 11, 1996, FBI agents executed a search warrant on Matthews' home. The search team found work papers regarding various topics, but no notes or other research documents regarding child pornography or child prostitution. Nor did the search team find any depictions of child pornography. Matthews confirms that he did not save his on-line conversations and acknowledges that he did not keep many notes for the child pornography article; he maintains that he gave his previous counsel the seven or eight pages of notes he had taken, but he has been unable to produce them.

During the search, FBI agents interviewed Matthews and his wife. According to the agents, Matthews stated that he had traded child pornography over the Internet to research his three-part series for WTOP but that he was not currently working on a child pornography story. Matthews and his wife maintain that Matthews did inform the agents that he was currently working on such a story.

On July 28, 1997, a federal grand jury indicted Matthews for violating the Protection of Children Against Sexual Exploitation Act, 18

4

U.S.C. § 2252 (1994 & Supp. IV 1998). Specifically, Matthews was charged with six counts of transmitting child pornography over the Internet in violation of 18 U.S.C. § 2252(a)(1) and nine counts of receiving child pornography over the Internet in violation of 18 U.S.C. § 2252(a)(2). These were the first criminal charges ever lodged against Matthews.

Matthews moved to dismiss the indictment, asserting that § 2252 was unconstitutional as applied to him, a bona fide journalist researching a news story. Specifically, Matthews argued that the statute infringed his First Amendment free speech and free press rights, and violated his due process rights because it contained no mens rea element requiring a person transmitting child pornography to "have a morally blameworthy mental state when doing so." The government opposed this motion, contending that the evidence showed Matthews had not received and transmitted child pornography solely for journalistic purposes, and even assuming he had, the statute was constitutional as applied to him. The government argued that Matthews' claim that he was receiving and transmitting child pornography to research a news story constituted no defense to the charges against him. On this basis, the government filed a motion in limine urging the district court to exclude any evidence, testimony, or argument regarding Matthews' alleged journalistic motive for trafficking in child pornography.

The district court denied Matthews' motion to dismiss and granted the government's motion in limine, concluding that the First Amendment provided no defense in Matthews' case. See United States v. Matthews, 11 F. Supp. 2d 656 (D. Md. 1998). Matthews then entered into a conditional plea agreement with the government, which the district court accepted. Under the plea agreement, Matthews pled guilty to one count of receiving child pornography and one count of transmitting child pornography, and reserved his right to appeal the district court's rulings on his motion to dismiss and the government's motion in limine, as well as all sentencing issues.

At the sentencing hearing, Matthews requested a downward departure based on his claim that he traded child pornography solely for news gathering purposes. The district court declined to grant a downward departure, finding that Matthews had failed to establish by a pre-

5

ponderance of the evidence that his motivation for trafficking in child pornography was solely to obtain information for an article.

Matthews raises three arguments on appeal. First, he asserts that New York v. Ferber, 458 U.S. 747 (1982), recognizes "a First Amendment privilege . . . to use child pornography as a research tool to create a work of journalism," and that the district court erred in prohibiting him from presenting evidence to a jury in support of this "defense."[1] Second, Matthews contends that § 2252(a) contravenes "due process by not including as an essential element that the defendant must have acted with a criminal intent." Third, he maintains that the district court erred during sentencing by denying his request for a downward departure and that Koon v. United States, 518 U.S. 81 (1996), overruled our precedent holding such a denial unreviewable.

Before turning to Matthews' arguments, we address the important constitutional principles underlying this case.

II.

The First Amendment freedoms of speech, the press, and assembly are firmly rooted in our ideals of liberty and democracy, and "[t]he durability of our system of self-government hinges upon the preservation of these freedoms." Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations, 413 U.S. 376, 382 (1973). The protection afforded these freedoms against legislative abridgment is expansive, and courts consistently invoke the basic principle that "ideas having even the slightest redeeming social importance" deserve sanctuary within the public discourse. Roth v. United States, 354 U.S. 476, 484 (1957). Our "democracy stands on a stronger footing when courts protect First Amendment interests against legislative intrusion, rather

_____

[1] Matthews chooses to refer to his position as the assertion of a First Amendment defense. Yet, the essence of his argument is that the Constitution requires that we narrowly construe § 2252 and thus exclude him from its reach. His position therefore may be more properly characterized as an "as-applied" challenge to § 2252, but for convenience we will use Matthews' terminology and phrase the inquiry as whether there is a First Amendment defense to conviction under the statute.

6

than deferring to merely rational legislative judgments in this area." Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 519 (1981).

First Amendment freedoms thus provide an indispensable foundation for our government, but these freedoms are not absolute. For example, the Constitution permits limitations on "speech which advocates conduct inimical to the public welfare," American Communications Ass'n, C.I.O. v. Douds, 339 U.S. 382, 394-95 (1950), or speech which constitutes "no essential part of any exposition of ideas," R.A.V. v. City of St. Paul, 505 U.S. 377, 383-85 (1992) (internal quotation marks omitted). Moreover, the Supreme Court, "in different contexts, has consistently held that government may directly regulate speech to address extraordinary problems, where its regulations are appropriately tailored to resolve those problems without imposing an unnecessarily great restriction on speech." Denver Area Educ. Telecommunications Consortium, Inc. v. FCC, 518 U.S. 727, 741 (1996).

The protection of children clearly constitutes a "public welfare" interest justifying regulation of speech in certain circumstances. See, e.g., Reno v. ACLU, 521 U.S. 844 (1997) (addressing constitutionality of two provisions of Communications Decency Act of 1996 intended to protect children from "indecent" and "patently offensive" material on Internet, but finding statutory provisions overbroad); FCC v. Pacifica Found., 438 U.S. 726, 748-49 (1978) (upholding FCC restrictions on broadcast in part because of broadcast's "unique[ ] accessib[ility] to children"); Ginsberg v. New York, 390 U.S. 629, 639-40 (1968) (upholding statute prohibiting sale of obscene materials to minors); see also Prince v. Massachusetts , 321 U.S. 158, 168 (1944) (stating that "[a] democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens"). Of particular importance here, the Supreme Court has consistently upheld restrictions on First Amendment freedoms to combat the "extraordinary problem[ ]" of child pornography. See Osborne v. Ohio, 495 U.S. 103 (1990); New York v. Ferber, 458 U.S. 747 (1982).

With these principles in mind, we address each of Matthews' arguments in turn.

7

III.

Initially, Matthews presents an issue of first impression in this circuit: does the First Amendment permit a bona fide reporter to trade in child pornography to "create a work of journalism"? Matthews was convicted of violating the Protection of Children Against Sexual Exploitation Act. The statute prohibits the knowing interstate transportation, by any means including by computer, of "any visual depiction . . . of a minor engaging in sexually explicit conduct" or the knowing receipt of such a depiction that has been "transported in interstate . . . commerce . . . by any means including by computer." 18 U.S.C. § 2252(a)(1), (2). It contains no exception for transmission or receipt of child pornography with artistic, scientific, literary, journalistic, or other "legitimate" value. Nevertheless, Matthews maintains that the First Amendment entitles him to a defense to conviction under the statute.

Matthews principally relies on New York v. Ferber, which involved a constitutional challenge to a state statute, in relevant respects identical to § 2252(a)(1) and (2). See 458 U.S. at 750-51.[2] In Ferber, the owner of a bookstore "specializing in sexually oriented products" asserted that a New York statute barring dissemination of materials depicting a child engaged in sexual conduct, regardless of whether such materials were obscene, violated the First Amendment. Id. at 751-52. The Supreme Court unanimously upheld the statute, finding that, consistent with the First Amendment, a state could prohibit the distribution of material that depicted children engaged in sexual acts, even if that material was not obscene. Id. at 756-66. Thus, the Court determined not only that child pornography, like obscene adult pornography, was without First Amendment protection, but also that a legislature is "entitled to greater leeway in the regulation of pornographic depictions of children" than in the regulation of adult pornography. Id. at 756.

_____

**2** In response to Ferber, Congress amended an earlier version of § 2252 by eliminating both the obscenity and commercial purpose requirements in order to increase the effectiveness of federal laws designed to combat proliferation of child pornography. See H.R. Rep. No. 98-536, at 2-7 (1983), reprinted in 1984 U.S.C.C.A.N. 492, 493-98.

8

The Ferber Court concluded that a legislature was entitled to "greater leeway" when enacting restrictions on child pornography, because child pornography generates a set of harms distinct from those generated by pornographic depictions of adults--harms related to the sexual abuse of children. The Court found that "[t]he prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance." Id. at 757. The First Amendment, the Court explained, does not prohibit a state from banning the dissemination of child pornography not "legally obscene under the Miller [v. California, 413 U.S. 15 (1973),] test" because that test, "like all general definitions of what [adult pornography] may be banned as obscene, does not reflect the State's particular and more compelling interest in prosecuting those who promote the sexual exploitation of children." Ferber, 458 U.S. at 760-61.

Citing a wealth of evidence, the Court found that distribution of child pornography abused children by creating a permanent record of their participation in sexual activities. This record, in turn, permitted the harm to the child to be exacerbated each time the material was circulated and led to the creation of distribution networks that fostered further exploitation. Id. at 759. Given the secrecy inherent in the production of child pornography, the Court noted that "imposing severe criminal penalties" on those who distribute it may be the "only practical" way to control the industry. Id. at 760. The Court also found that the "value of permitting live performances and photographic reproductions of children engaged in lewd sexual conduct is exceedingly modest, if not de minimis," id. at 762, and concluded that classifying child pornography as "outside the protection of the First Amendment" accorded with its precedent making the content of speech actionable if the evils of the speech outweigh the expressive interest at stake. Id. at 763-64.

Neither the Ferber Court's holding, nor its rationale for authorizing more stringent regulation of child pornography than of adult pornography, in any way assists Matthews. Indeed, by its careful explanation of the pernicious and lasting damage caused to children by the distribution of child pornography, the Court made a compelling case for upholding--without exception--the constitutionality of broad restrictive legislation criminalizing that activity.

9

Although, as Matthews points out, the Ferber Court did note that there were "limits on the category of child pornography . . . unprotected by the First Amendment," id. at 764, those limits do nothing to assist Matthews either. The Court's strictures do not establish a "legitimate" value exception to legislative prohibitions on the distribution of child pornography, but rather emphasize the need for clarity in statutory language imposing such prohibitions. For example, the Ferber Court directed that a statute criminalizing the dissemination of child pornography must adequately define the forbidden conduct, prohibit only depictions of sexual conduct by children below a certain age, and contain some requirement "of scienter on the part of the defendant." Id. at 764-65. None of these"limits" establish the availability of a First Amendment defense to criminal conviction under a properly drawn statute.

Rather than basing his asserted First Amendment defense on these limits, Matthews instead focuses on a small portion of the Ferber Court's discussion of the challenged statute's possible overbreadth. The Court held that the New York statute was not overbroad, that it in fact presented "the paradigmatic case of a state statute whose legitimate reach dwarfs its arguably impermissible applications." Id. at 773. In so ruling, the Court noted that the lower court had been "understandably concerned that some protected expression . . . would fall prey to the statute." Id. But the Ferber Court wondered "[h]ow often, if ever, it may be necessary to employ children to engage in [sexual] conduct . . . to produce educational, medical, or artistic works." Id. Doubting that these "arguably impermissible applications" would "amount to more than a tiny fraction of the materials within the statute's reach," id., the Court concluded that "`whatever overbreadth may exist should be cured through case-by-case analysis.'" Id. at 773 74 (quoting Broadrick v. Oklahoma, 413 U.S. 601, 615-16 (1973)). Matthews contends the Ferber Court thus recognized the possibility of a First Amendment defense to criminal conviction for dissemination of child pornography in certain circumstances.

Specifically, Matthews maintains that the First Amendment protects child pornography utilized as part of any"work of educational, medical or artistic value," to "create a work of academic, educational or political significance," or "a work of educational, literary, and political value," and for other "legitimate use[s]," including "journal-

10

istic use[s]."**3** Application of a criminal statute to such uses would, Matthews maintains, violate the First Amendment. He asserts that in rejecting this contention the district court interpreted Ferber "too narrow[ly]."

Matthews and his amici present powerful rhetoric urging that he (and anyone else asserting such a defense) be allowed to present this defense to a jury. Let the jury decide, they argue: if the jury concludes that Matthews traded in pornography solely for a proper purpose, then the First Amendment prevents conviction; if the jury concludes that he acted for another purpose, then conviction is appropriate. The argument has visceral appeal. One of our bedrock principles is that every man deserves his day in court and the opportunity to have a jury consider his best defense. But the law does not permit a defendant to present a defense unless the law recognizes that defense. See, e.g., United States v. Fuller, 162 F.3d 256, 261 (4th Cir. 1998), cert. denied, 120 S. Ct. 75 (1999); United States v. King, 126 F.3d 987, 995 (7th Cir. 1997). And, notwithstanding the skill of Matthews' advocacy, Ferber does not provide the broad defense he seeks to raise in this case.

Matthews' asserted First Amendment defense--a derivation of the Miller standard from the obscenity context--misses the fundamental distinction between child pornography and adult pornography that the

_____

**3** Matthews clarified at oral argument that he does not claim that a journalist engaged in news gathering activities is entitled to any special exemption from § 2252, not available to others. One of Matthews' amici, however, does seem to make this contention. See  Brief of the Reporters Committee for Freedom of the Press at 5-6 ("Strict application of these [criminal] statutory provisions to news gathering, even if they are otherwise valid, can unconstitutionally burden the right of journalists to gather the news."). Amici's argument is ill-advised. Although the First Amendment protects "news gathering" activities, it does not "confer[ ] a license on either the reporter or his news sources to violate valid criminal laws." Branzburg v. Hayes, 408 U.S. 665, 691 (1972). The Supreme Court has expressly instructed that "generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." Cohen v. Cowles Media Co., 501 U.S. 663, 669 (1991); see also Food Lion, Inc. v. Capital Cities/ABC, Inc., 194 F.3d 505 (4th Cir. 1999).

11

Ferber Court sought to draw. The government has an interest in prohibiting the dissemination of both. But the government's interest in prohibiting the distribution of adult pornography--to protect "the sensibilities of unwilling recipients," Miller , 413 U.S. at 19--pales in comparison to its interest in prohibiting the dissemination of child pornography--to prevent "sexual exploitation and abuse of children." Ferber, 458 U.S. at 757. When adult pornography, taken as a whole, has some "serious literary, artistic, political, or scientific value," Miller, 413 U.S. at 24, that value ameliorates its affront to "the sensibilities of unwilling recipients." In contrast, any literary, artistic, political, scientific (or journalistic) value of child pornography does nothing to ameliorate its harm to children. Ferber holds that while the government can ban only obscene adult pornography (that which, taken as a whole, "lacks serious literary, artistic, political, or scientific value"), the government can ban child pornography even if not obscene. 458 U.S. at 764. In other words, although the obscenity test for adult pornography contains the type of First Amendment defense that Matthews urges us to recognize, the Ferber Court unequivocally rejected such a defense in the context of child pornography offenses.

Indeed, the Ferber Court carefully outlined why the Miller obscenity test was not a "satisfactory solution to the child pornography problem." Id. at 761. The Court explained:

> [T]he question under the Miller test of whether a work, taken as a whole, appeals to the prurient interest of the average person bears no connection to the issue of whether a child has been physically or psychologically harmed in the production of the work. Similarly, a sexually explicit depiction need not be "patently offensive" in order to have required the sexual exploitation of a child for its production. In addition, a work which, taken on the whole, contains serious literary, artistic, political, or scientific value may nevertheless embody the hardest core of child pornography. "It is irrelevant to the child [who has been abused] whether or not the material . . . has a literary, artistic, political, or social value."

Id. (emphasis added) (citation omitted) (bracketed material supplied by Supreme Court). The broad First Amendment defense Matthews

12

seeks to assert, which derives from the obscenity test for adult pornography, is simply irreconcilable with the Ferber Court's express conclusion that material containing "serious literary, artistic, political, or scientific value may nevertheless embody the hardest core of child pornography." Id.

We believe several other factors lead to the inevitable conclusion that the Ferber Court rejected even the possibility of a broad First Amendment defense like that proposed by Matthews. First, the Court made plain that any impermissible applications of a statute banning the distribution of child pornography would be exceedingly few in number. The Court not only "consider[ed] it unlikely that visual depictions of children performing sexual acts . . . would often constitute an important and necessary part of a literary performance or scientific or educational work," id. at 762-63, but also "seriously doubt[ed]" that such "applications of the statute [could] amount to more than a tiny fraction of the materials within the statute's reach." Id. at 773.

Thus, any possible First Amendment defense to criminal conviction under a statute prohibiting the dissemination of child pornography would necessarily be a limited one, not, as Matthews maintains, a defense available to any person who asserted that the child pornography in which he traded had some social value or that he used the pornography for some proper purpose. Indeed, if the First Amendment defense were as broad, and the possible impermissible applications of a statute banning dissemination of child pornography as many as Matthews purposes, the Ferber Court could not have concluded, as it did, that the statute before it was not "substantially overbroad." Id. at 774.

Moreover, the Ferber Court went to considerable pains to avoid holding that a statute banning dissemination of child pornography could ever be impermissibly overbroad. Although the Court acknowledged the possibility that such a statute might ban protected speech, it carefully characterized such impermissibly broad applications of the statute as "arguably impermissible applications" of a "possibly invalid" statute. Id. at 773. The Ferber Court noted that it was unsure "[h]ow often, if ever," "educational, medical, or artistic works" would require the employment of children to engage in sexual conduct, and

13

directed that "whatever overbreadth may exist" could be remedied by analysis of the facts to which the statute's sanctions "assertedly" would not apply. Id. at 773-74.

Indeed, Justices Brennan, Marshall, and Stevens concurred only in the judgment in Ferber because they disagreed with the majority of the Court on this very point.**4** They would have held that the First Amendment did prohibit applying a statute banning dissemination of child pornography in certain instances. See id. at 776 (Brennan, J., with whom Marshall, J., joins, concurring in the judgment) ("[A]pplication of . . . any similar statute to depictions of children that in themselves do have serious literary, artistic, scientific, or medical value, would violate the First Amendment."); id. at 777 (Stevens, J., concurring in the judgment) ("[T]he state statute that respondent violated prohibits some conduct that is protected by the First Amendment.").

Furthermore, although the Ferber Court did not identify the precise parameters of the few instances in which a child pornography statute might impermissibly ban protected speech, it did suggest that material, which in isolation constituted hard core child pornography, could never qualify for such protection. See Ferber , 458 U.S. at 764 (explaining that, unlike arguably obscene material, in determining whether a depiction embodies child pornography, the material "need not be considered as a whole"); see also id. at 779-80 (Stevens, J., concurring in the judgment) (suggesting that the Court "appear[ed] to hold . . . the First Amendment inquiry might be limited to determining whether the offensive scene, viewed in isolation, is lewd"). Matthews pled guilty to receiving a depiction of a prepubescent minor female engaged in sexual intercourse with an adult male and to transmitting a depiction of a female performing oral sex on a prepubescent minor female. Clearly, irrespective of the ultimate journalistic use to which Matthews may have put these depictions, they unquestionably constitute hard core child pornography when viewed in isolation.

_____

**4** Accordingly, the views expressed in those separate concurring opinions have no precedential value. Nonetheless, because Matthews heavily relies on Justice Stevens' concurrence, we carefully consider it within. See infra at 16-17.

14

The Ferber Court's instruction that child pornography be judged in isolation, moreover, dovetails with Justice O'Connor's suggestion that any possible First Amendment defense must be very narrowly defined. Justice O'Connor, who joined both the judgment and opinion of the Court, wrote a short concurring opinion in which she indicated that, in her view, "the compelling interests identified" by the Court suggested that a government might constitutionally ban "knowing distribution of works depicting minors engaged in explicit sexual conduct, regardless of the social value of the depictions." Id. at 774. She went on to acknowledge, however, that "it is quite possible" a statute might be overbroad to the extent it "bans depictions that do not actually threaten the harms identified by the Court." Id. at 775.

Although Justice White's opinion for the Ferber Court does not expressly adopt Justice O'Connor's narrow formulation of a possible First Amendment defense, it is entirely consistent with it. For example, the alternatives Justice White suggests to depicting children in literary, scientific, or educational works--use of a person over the statutory age who looks younger, or a simulation outside of the prohibition of the statute--also reflect a paramount interest in avoiding the "harms identified by the Court."[5] Furthermore, as Justice O'Connor noted, the only two examples of child pornography that might be

_____

[5] In Osborne, the Supreme Court recognized that a state's interest in regulating the possession of child pornography included not only the protection of children used to create the material, but also protection of children who may be sexually abused by pedophiles who use child pornography to entice their victims to engage in sexual conduct. 495 U.S. at 111 & n.7. Congress reiterated these interests in enacting the Child Pornography Prevention Act (CPPA) of 1996. See Pub. L. No. 104-208, § 121(1), 1996 U.S.C.C.A.N. (110 Stat. 3009-26 to -27).

The CPPA also added a broad definition of "child pornography" that includes computer-generated images, or "virtual" child pornography, see 18 U.S.C. § 2256(8)(B),(D), thus banning at least some "simulation[s]" that might have been beyond the reach of the statute at issue in Ferber. Compare United States v. Acheson, 195 F.3d 645 (11th Cir. 1999) (upholding constitutionality of CPPA provisions that prohibit virtual child pornography); United States v. Hilton, 167 F.3d 61 (1st Cir.) (same), cert. denied, 120 S. Ct. 115 (1999), with Free Speech Coalition v. Reno, 198 F.3d 1083 (9th Cir. 1999) (holding provisions unconstitutionally vague and overbroad).

15

impermissibly banned cited in Justice White's opinion for the Court --pictures in medical textbooks and the National Geographic-- constitute depictions that well might not threaten these harms. As Justice O'Connor explained:

> . . . clinical pictures of adolescent sexuality, such as those that might appear in medical textbooks, might not involve the type of sexual exploitation and abuse targeted by New York's statute. Nor might such depictions speed the poisonous "kiddy porn" market that New York and other States have attempted to regulate. Similarly, pictures of children engaged in rites widely approved by their cultures, such as those that might appear in issues of the National Geographic, might not trigger the compelling interests identified by the Court.

Id.

Because we conclude that Matthews cannot avail himself of whatever protection the First Amendment offers to those who disseminate child pornography, we, too, need not define the exact parameters of a possible First Amendment defense. We do note, however, that the Ferber Court's observation that impermissible applications of a child pornography statute would be rare, its directive to view pornographic depictions of children in isolation, its examples of depictions that might be impermissibly banned, and its suggested alternatives to the use of children in socially valuable works clearly indicate that one could invoke a First Amendment defense only if the depictions did not threaten the enormous harms to children the Court identified. As his counsel properly conceded at oral argument, in view of Matthews' transmission and receipt of hard core child pornography, he obviously could not obtain any benefit from a First Amendment defense so limited.

Matthews seeks instead to rely on the First Amendment defense formulated in Justice Stevens' separate opinion in Ferber, in which no other justice joined. Justice Stevens stated that, in his view, exhibition of child pornography "before a legislative committee studying a proposed amendment to a state law, or before a group of research scientists studying human behavior, could not . . . be made a crime." Id.

16

at 778 (Stevens, J., concurring in the judgment). Although Justice Stevens' observation has intuitive appeal, its doctrinal roots are unclear. Justice Stevens cites no support for his comments and we have not found a single case in which any court has explicitly held that a proper or valid "use" of child pornography defeats its illegality. The mischief that could result from a rule that a "good" use of child pornography legitimizes the material itself is apparent. It may be true, as Justice Stevens suggests, that the First Amendment "always requires some consideration of" the "content" and "context" of a specific act of communication, id., but prior decisions addressing the First Amendment protection to be afforded pornography suggest that the critical context is that inherent in the material itself. The Court's child pornography decisions, both Ferber and more recently Osborne, focus on the depictions themselves and the harm to children they inflict or provoke. Tellingly, Justice Brennan, joined by Justice Marshall in his concurrence in Ferber, also focused on the depictions themselves rather than their use. 458 U.S. at 776. **6**

To recapitulate, we believe that Ferber cannot fairly be read to permit a defense of the sort urged by Matthews. The asserted defense, apparently derived from the obscenity cases, fails to account for the discrete set of harms to which child pornography legislation is addressed. Such a defense would result in far more possibly impermissible applications of the statute than Ferber envisaged, fail to view the depictions in isolation as Ferber directed, and allow the dissemination of depictions that threaten the very harms to children described in Ferber.

Finally, contrary to Matthews' contention, the legislative history of § 2252 does not "indicate[ ] that Congress assumed that a defense based on the use of the materials [constituting child pornography] for

_____

**6** We also note that one of the uses of child pornography that Justice Stevens suggested "could not . . . be made a crime"--a showing of child pornography before a legislative committee considering proposed statutory amendments--would seem in no event to provide a basis for criminal prosecution. See Bogan v. Scott-Harris, 118 S. Ct. 966, 972 (1998) (quoting Tenney v. Brandhove, 341 U.S. 367, 376 (1951), to hold that "[a]bsolute legislative immunity attaches to all actions taken `in the sphere of legitimate legislative activity'").

17

a constitutionally protected purpose was implicit in the statute." Following the Supreme Court's decision in Ferber , Congress did consider providing an affirmative defense in § 2252 for certain categories of child pornography which, "when taken as a whole, possess[ ] serious literary, artistic, scientific, social, or educational value." H.R. Rep. No. 98-536, at 12 (1983), reprinted in 1984 U.S.C.C.A.N. 492, 503 (statement of Mark M. Richard, Deputy Ass't Att'y Gen.). The Justice Department "strongly oppose[d]" the addition of this defense because it believed the defense would "essentially retain[ ] the obscenity standard for certain categories of child pornography" and thus "significantly undercut[ ] the basic philosophy of Ferber." Id. A Justice Department official further explained:

> "Even in the absence of the affirmative defense provided in H.R. 2432, a defendant may take the position that the application of the child pornography statute to his case is unconstitutional and falls within the "tiny fraction of the materials within the statute's reach" which the Court recognized should receive constitutional protection. 102 S. Ct. at 3363. Thus, the affirmative defense provision (which was not in the New York statute approved in Ferber) is unnecessary.

Id. at 504.

Congress, of course, ultimately determined not to amend § 2252 to provide this affirmative defense.[7] One district court has interpreted that congressional decision to be conclusive as to Congress's intent not to exempt materials with serious literary, scientific, or educational value. Stanley v. United States, 932 F. Supp. 418, 421 (E.D.N.Y. 1996) (rejecting First Amendment defense of any kind in a case involving forfeiture of child pornography).

However, another district court, in an opinion on which Matthews relies, concluded that in light of the Justice Department's position that

_____

[7] In 1998, Congress did enact a limited affirmative defense to charges for possession of child pornography under§ 2252(a)(4) for those who "possess[ ] less than three matters containing any visual depiction" of child pornography and who either destroy the depictions or report the matter to law enforcement. See 18 U.S.C.§ 2252(c).

the defense would not be "necessary," Congress's rejection of the affirmative defense "could have just as easily meant that Congress acknowledged that some small amount of material literally covered by the statute was nonetheless protected by the guarantee of free speech." United States v. Lamb, 945 F. Supp. 441, 449 (N.D.N.Y. 1996).

For this reason, the district court in Lamb upheld the constitutionality of § 2252 in the face of an overbreadth challenge, concluding that a defendant could assert a defense that the statute was unconstitutional as applied to him for any of the reasons cited in Justice O'Connor's or Justice Stevens' concurring opinions, including the "good" use argument that the defendant's "possession of child pornography was pursuant to research he was undertaking in his capacity as a psychiatrist." Id. at 450; see also United States v. Bryant, No. CR 92-35R (W.D. Wash. May 13, 1992) (unpublished order) (permitting defendant to assert a similar defense as an academic researcher).**8**

For the reasons explained above, we do not agree that Ferber permits such an expansive defense. Nor does our reading of the "legislative history" of § 2252 relied on by the Lamb Court support this

_____

**8** Matthews also relies on United States v. Upham, 168 F.3d 532, 534 (1st Cir.) (affirming conviction of defendant who presented a defense at trial that his sole purpose in violating § 2252 was "to produce a serious literary work"), cert. denied, 119 S. Ct. 2353 (1999), and United States v. Hibbler, 159 F.3d 233 (6th Cir. 1998) (unpublished appendix at A14-15) (affirming district court's refusal to give instruction as to public duty defense to § 2252 because defendant, a school principal, lacked evidentiary support for the defense), cert. denied, 119 S. Ct. 1278 (1999). We accord substantial deference to the views of our sister circuits, but we note that in this instance neither the Upham nor Hibbler court directly considered the breadth of a possible First Amendment defense to § 2252. We believe that careful consideration of that question compels the conclusion we have reached here and note that another of our sister circuits seems to agree. See United States v. Bausch, 140 F.3d 739, 741-42 (8th Cir. 1998) (refusing to find plain error where defendant failed to raise at trial his alleged First Amendment defense that he possessed child pornography as an aid to create artwork, and observing that the Ferber Court "cast considerable doubt on the viability of an as-applied challenge like the one in this case"), cert. denied , 119 S. Ct. 806 (1999).

19

conclusion. In fact, the Justice Department official not only testified as noted above but also cautioned Congress:

> Including an affirmative defense provision in the federal child pornography statute in our view would produce consequences far beyond protecting the small class of materials referred to by the Court. It may provide an appealing loophole for pornographers intent upon thwarting the purpose of the statute by placing otherwise proscribed child pornography materials within a legitimate literary or scientific work. Proving the defense--that the medium, when taken as a whole, possesses serious literary, artistic, scientific, social, or educational value--would not be difficult in such cases. The affirmative defense proposed in H.R. 2432 is practically an invitation to distribute child pornography in a conviction-proof medium.

1984 U.S.C.C.A.N. at 504 (emphasis added). Moreover, a representative of the United States Postal Service testified:

> Most often, our investigations have resulted in the identification of collectors, some of whom sell their material while others do not. Those who do not sell their material often loan or trade collections with others who share their interest.

> Only rarely does the child pornographer measure up to the stereotype image of the "dirty old man." Many of those displaying an interest held respected positions within their communities and have been able to conceal their interest in child pornography for years. There have been the professional dealers identified in our investigations, but there have also been clergymen, teachers, psychologists, journalists, and businessmen.

Id. at 507 (statement of Charles R. Clauson, Ass't Chief Postal Inspector for Admin.) (emphasis added). To the extent these departmental positions speak to the issue before us, they suggest that after considering them, Congress chose to reject the type of broad affirmative defense urged by Matthews, not embrace it. Congress enacted a statute that would subject to criminal prosecution not only child por-

20

nography dealers, but also those who lack a profit motive, including individuals, like journalists, whose professional standing might help to disguise a fetish for such material.

Matthews' version of the facts, which we accept as true at this juncture, present what initially appears to be a close question. But, at end, after careful review of Supreme Court precedent and the legislative considerations underlying 18 U.S.C. § 2252, we are persuaded that Matthews' asserted First Amendment defense simply enjoys no support in the law. Accordingly, we must reject it.

IV.

Alternatively, Matthews argues that if § 2252 is interpreted to require only receipt or transmission of images known to be child pornography, the statute violates the Due Process Clause "because it contains no criminal intent requirement, even though nothing suggests that Congress desired such a harsh result." Relying on United States v. X-Citement Video, Inc., 513 U.S. 64, 78 (1994), and the statute's plain language, the district court rejected this argument. See 11 F. Supp. 2d at 660.

Section 2252 prohibits "any person" from "knowingly transport[ing or]. . . receiv[ing]" child pornography. 18 U.S.C. § 2252(a). Matthews asserts that the absence of a bad motive or evil intent mens rea requirement in the statutory language poses a constitutional problem with § 2252. He maintains that the lack of such a criminal intent requirement in the wording of the statute does not eliminate it as an element of the offense absent clear evidence that Congress intended such a result. See United States v. United States Gypsum Co., 438 U.S. 422, 438 (1978). He also argues that, particularly in light of the possibility that an Internet user could innocently view child pornography, the requisite mens rea must reflect a bad motive or evil intent in order to target those who produce and trade child pornography for profit-motivated or prurient purposes.[9]

_____

9 We find this latter argument particularly unpersuasive given the affirmative defense in § 2252(c). See supra at 18 n.7.

21

Recognizing that "some element of scienter" is required for child pornography prosecutions, see Ferber, 458 U.S. at 765, the Supreme Court concluded in X-Citement Video that§ 2252 requires the government to prove that a defendant knew that he was transporting or receiving depictions of a sexually explicit nature and that the individuals depicted were minors. In reaching this conclusion, the Court relied repeatedly on Morissette v. United States , 342 U.S. 246 (1952) --a case on which Matthews heavily relies--and referred to the axiom that a court will not interpret a statute in a way that would render it unconstitutional if a constitutional interpretation is supportable. The X-Citement Video Court did not expressly hold that § 2252, as so construed, passed constitutional muster, nor did it address the precise contention that Matthews raises, i.e., that the statute also requires the government to prove that a defendant acted with a bad motive. Given the Court's interpretation of § 2252 and its reliance on Morissette, however, it seems unlikely that Matthews' mens res argument survives X-Citement Video.

Even if it does, the argument must fail. Although it is true, as Matthews contends, that common law crimes require proof of a defendant's guilty mind, "[m]ost federal criminal statutes . . . require proof that a defendant act knowingly or wilfully or have knowledge with regard to one or more essential elements of the crime defined by that statute." 1A Kevin F. O'Malley et al., Federal Jury Practice and Instructions § 17.02 (5th ed. 2000). In enacting and subsequently amending § 2252, Congress settled on "knowingly" as the required mental state. By interpreting the knowledge requirement to apply to the sexually explicit nature of the materials as well as to the involvement of minors in the materials' production, the X-Citement Video Court construed the statute so that all statutory elements contain a "knowledge" scienter requirement. The plain language of the statute requires nothing more.

Nor does the Constitution mandate that the statute be interpreted to require proof that a defendant acted with a bad motive or evil intent --in this case, that Matthews transmitted child pornography to satisfy some prurient interest, rather than to pursue his asserted journalistic purpose. Indeed, in Osborne, the Court upheld recklessness as a sufficient scienter requirement for an Ohio child pornography statute. 495

22

U.S. at 114 n.9. The cases on which Matthews relies simply do not support his contrary contention.

To be sure, the cases Matthews cites do hold that "an injury can amount to a crime only when inflicted by intention," Morissette, 342 U.S. at 250, and that "the requirement of some mens rea for a crime is firmly embedded" in American jurisprudence. Staples v. United States, 511 U.S. 600, 605 (1994); see also Gypsum Co., 438 U.S. at 436-37. For this reason, generally, offenses that require no mens rea are disfavored. See Liparota v. United States, 471 U.S. 419, 426 (1985). But, Morissette, Staples, Gypsum Co., and Liparota, no matter how carefully they are read, do not hold, or even suggest, that the Constitution requires the sort of bad motive mens rea Matthews attempts to read into § 2252.

For example, in Morissette, the Court did not conclude that the government had to prove a defendant charged with "knowing conversion" acted for some bad motive, but only that he "had knowledge of the facts . . . that made the taking a conversion." 342 U.S. at 271. Similarly, in Staples the Court found that in order to prove a violation of 26 U.S.C. § 5861(d), the government must prove that a defendant knew of the characteristics of his firearm that brought it within the scope of the Act, not that the defendant had a bad motive. 511 U.S. at 619-20.

Recently, we dealt with a similar argument in United States v. Fuller, 162 F.3d 256 (4th Cir. 1998), cert. denied, 120 S. Ct. 75 (1999). We held that in order to prove distribution of crack cocaine, the government had to prove a defendant knew of the facts that constituted the offense, but not that he acted with an evil motive. In Fuller, the mayor of a small town did not deny selling drugs, but claimed that he had done so as part of his own undercover investigation into employee theft and drug use at a local convenience store. The mayor maintained, therefore, that he was not guilty of violating any federal drug laws because he "did not have the specific intent to commit those crimes." Id. at 258. We rejected this defense, reasoning:

> [I]t is not a requirement of 21 U.S.C. § 841(a) that the defendant have specifically intended to violate the statute in order to be found guilty. The mens rea required by the stat-

23

ute is that the defendant "knowingly or intentionally" engage in the prohibited activities. To act "knowingly" is to act with "knowledge of the facts that constitute the offense" but not necessarily with knowledge that the facts amount to illegal conduct, unless the statute indicates otherwise. Since nothing in the text of 21 U.S.C. § 841(a) indicates that Congress meant to punish only those defendants who actually intended to violate the statute, Fuller's admission that he was aware that he was selling crack cocaine . . . is all that was required to prove that his conduct was knowingly carried out.

Id. at 260 (citations and emphasis omitted). Similarly, Matthews' admission that he knew he was receiving and transmitting child pornography is "all that was required to prove that his conduct was knowingly carried out." Id.

In sum, by arguing that conviction under § 2252 requires the government to prove that a defendant trafficked in child pornography with a bad motive or evil intent to cause the social harm of the offense, Matthews attempts to insert the term "willfully" into the statute. The Constitution does not compel this. If Congress had intended to require "willfulness," it certainly could have drafted a statute so stating. It did not do so. The scienter requirement Congress did choose--"knowingly"--evidences no intent to exempt "innocent" use of child pornography from prosecution.

V.

Finally, Matthews asserts that the district court clearly erred in the factual findings that form the basis for its refusal to grant a downward departure from the applicable sentencing range set forth in the United States Sentencing Guidelines (USSG). On the basis of the testimony of Matthews' expert, the lack of any notes indicating that Matthews was writing an article on child pornography during 1996, an FBI agent's testimony that Matthews failed to inform the FBI that he was trading child pornography in order to research a story, and Matthews' "clandestine" behavior, the district court found that Matthews had not demonstrated by a preponderance of the evidence that he trafficked in child pornography solely for a journalistic purpose. The court thus

24

refused to depart downward from the recommended Guidelines range under USSG § 5K2.0 or § 5K2.11. Under our circuit precedent that refusal is not reviewable on appeal. Matthews argues that the Supreme Court's decision in Koon v. United States, 518 U.S. 81 (1996), implicitly overrules our precedent.

Prior to Koon, we joined seven other circuits in ruling that the factual findings underlying a district court's refusal to depart downward from the prescribed Guidelines range could be reviewed only when the district court "was under the mistaken impression that it lacked the authority to depart." See United States v. Underwood, 970 F.2d 1336, 1338 (4th Cir. 1992) (citing United States v. Bayerle, 898 F.2d 28, 30 (4th Cir.) (collecting cases from other circuits), cert. denied, 498 U.S. 819 (1990)). In the present case, the district judge clearly recognized his authority to depart because he specifically indicated that he would have granted a downward departure if he had been convinced that Matthews traded child pornography solely to conduct research for an article on the subject. Therefore, unless, as Matthews maintains, Koon overrules Underwood and Bayerle, circuit precedent prevents review of the district court's refusal to depart downward.

We believe that it is clear that Koon does not affect the holding in Underwood and Bayerle. Koon addressed the issue of the appropriate standard of review to be applied to a district court's decision to depart. The Koon Court concluded that, as a general rule, a reviewing court must apply an abuse-of-discretion standard of review, and thus give substantial deference to a district court's decision to depart from the Guidelines because "it embodies the traditional exercise of discretion by a sentencing court." Koon, 518 U.S. at 91, 98, 100. Koon did not address or affect review of a district court's decision not to depart. See, e.g., United States v. Edwards, 188 F.3d 230, 238 (4th Cir. 1999), cert. denied, 120 S. Ct. 968 (2000); United States v. Castillo, 140 F.3d 874, 888 (10th Cir. 1998).

Therefore, circuit precedent prevents our consideration of Matthews' appeal of the district court's refusal to depart downward from the applicable Guidelines range.

VI.

For the above reasons, we affirm the judgment of the district court.

AFFIRMED

25